STATE OF CONNECTICUT *v.* ANTONIO RIVERA
(AC 20386)

Lavery, C. J., and Foti and Landau, Js.

Argued September 26[1]—officially released December 17, 2002

*Brian D. Russell*, special public defender, for the appellant (defendant).

---

[1] This appeal was first argued on December 13, 2001. Judge John J. Daly, a member of the panel that heard oral argument on that date, died before the panel was able to concur on a written decision. The appeal, therefore, was argued a second time.

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Warren Maxwell*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LANDAU, J. The defendant, Antonio Rivera, appeals from the judgments of conviction,[2] rendered after a jury trial, of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) or (5)[3] and 53-202k,[4] criminal possession of a firearm in violation of General Statutes (Rev. to 1997) § 53a-217 (a) (1),[5] carrying a pistol or revolver without a permit in violation of General Statutes (Rev. to 1997) § 29-35 (a) and tampering with a witness in violation of General Statutes § 53a-151. The court found that the defendant had committed a class

---

[2] The defendant was charged in two separate informations, one bearing docket number CR97-514107 for events that occurred on or about October 12, 1997, and the second bearing docket number CR98-517668 for events that occurred on or about January 6, 1998. On June 10, 1998, the court, *Clifford, J.*, granted the state's motions to consolidate the cases for trial.

[3] General Statutes § 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of a deadly weapon or a dangerous instrument; or . . . (5) with intent to cause physical injury to another person, he causes such injury to such person . . . by means of the discharge of a firearm.

"(b) Assault in the first degree is a class B felony . . . ."

[4] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[5] General Statutes (Rev. to 1997) § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm . . . when he possesses a firearm . . . and has been convicted of a capital felony, a class A felony . . . a class B felony . . . a class C felony . . . or a class D felony . . . . For the purposes of this section, 'convicted' means having a judgment of conviction entered by a court of competent jurisdiction."

B felony with a firearm, warranting a mandatory, non-suspendable term of five years imprisonment pursuant to § 53-202k.

On appeal, the defendant claims that (1) there was insufficient evidence to sustain the verdicts rendered by the jury, (2) the court improperly denied his motion to suppress the victim's pretrial photographic identification of the defendant and (3) the court improperly admitted into evidence the name and number of the defendant's prior felony convictions. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. On the evening of October 12, 1997, Jose Marti, the victim, was at the Copa Cafe (club) in Hartford playing pool. The defendant also was at the club and in the company of Josepha Guadalupe. The club was crowded. At about midnight, the victim accidentally bumped into the defendant. The men confronted one another and exchanged angry words, and the defendant invited the victim to step outside to settle their differences.

The victim accepted the defendant's challenge and followed him outside, believing that the two would engage in a fistfight. The defendant, however, brandished a knife. Guadalupe was a friend of both men; she had gone to school with the victim for years and had known the defendant for several weeks. When the defendant displayed his knife, Guadalupe intervened to stop the confrontation and convinced the victim to return to the club. Although the defendant was not willing to forget the incident, Guadalupe was able to persuade him to leave the club with her. She went back into the club to say goodbye to her uncle, who was the proprietor. The defendant followed her.

The defendant, his cousin, a third male and Guadalupe subsequently left the club as a group and congre-

gated about an automobile. The victim and a group of his friends followed them outside. The defendant and his cousin made disparaging comments about the victim. The victim and the defendant's cousin became embroiled in a verbal exchange, and then the victim punched the cousin in the face. The defendant became angry and demanded that Guadalupe hand him his jacket. Although she initially refused to do so, Guadalupe handed over the jacket after the defendant pushed her. The defendant took a handgun from the pocket of the jacket and shot the defendant in the abdomen from a range of four to five feet. When the victim turned and ran, the defendant fired two more shots at him. The victim reentered the club and was taken to a hospital by a friend. He underwent surgery for his injuries. A bullet that had pierced his bowels and a portion of his small intestines had to be removed. He later underwent a second surgery to remove a bullet that had lodged in his side.

Guadalupe was getting into an automobile when she heard the first shot. She turned to see the defendant holding a five to six inch chrome pistol in his hand. Guadalupe had not known that there was a weapon in the jacket and had not felt it when she handed the heavy leather garment to the defendant. She saw the defendant flee on foot. She then left the scene in the automobile of a female friend. The two drove around for a time to collect themselves and to discuss the situation.

Guadalupe returned to the club and spoke with police. She was reluctant to identify the defendant as the perpetrator of the crime, but did so when the police confronted her with the possibility of being charged as an accomplice. When Guadalupe returned to her apartment, she found the defendant waiting for her. He gave her a telephone number and instructed her to call him later to discuss the incident. The defendant left on a bicycle. Guadalupe subsequently went to her boy-

friend to discuss the matter and decided to call the police and give them the defendant's telephone number. She spoke to Officer Norman Godard of the Hartford police department at about 3:50 a.m.

On January 6, 1998, the defendant telephoned Guadalupe and accused her of implicating him in the shooting of the victim. He told her to leave the area so that she would not be available to testify against him. She refused to leave, and the defendant threatened her. Guadalupe reported the defendant's threats to Detective Stephen Grabowski. At that time, she identified the defendant from an array of photographs and gave a written statement to the police.

At the conclusion of the state's case-in-chief, the defendant orally moved for a judgment of acquittal, which the court denied. The defendant presented no evidence. On July 28, 1999, the jury returned a verdict of guilty on the charges of assault in the first degree, criminal possession of a firearm, carrying a pistol or revolver without a permit and tampering with a witness. Thereafter, the state entered a nolle prosequi as to the charge of attempt to commit murder.

On November 10, 1999, the court sentenced the defendant to seventeen years in prison for the conviction of the three charges stemming from the October incident. The court also determined that the defendant was guilty of violating § 53-202k and enhanced the sentence by five years. The total sentence for that conviction, therefore, was twenty-two years. The court also sentenced the defendant to eighteen months in prison for his conviction of the charge of tampering with a witness, which is to be served consecutively to the sentence for the other three charges. The defendant's total effective sentence was twenty-three and one-half years. The defendant appealed. Where necessary, additional facts will be supplied.

I

The defendant first claims that there was insufficient evidence to sustain the jury's verdict of guilty of assault in the first degree, criminal use of a firearm, carrying a pistol or revolver without a permit and tampering with a witness, and as a consequence, that his state and federal rights to due process were violated.[6] The basis of the defendant's claim is that the evidence was circumstantial rather than direct. We do not agree with his claims.

"It is axiomatic that the state, in a criminal case, has the burden of proving every essential element of the crime charged beyond a reasonable doubt. [*State* v. *Jackson*, 176 Conn. 257, 258, 407 A.2d 948 (1978)]. . . . [P]roof beyond a reasonable doubt is such proof as precludes every reasonable hypothesis except that which it tends to support and is consistent with the defendant's guilt and inconsistent with any other rational conclusion. Id., 263–64." (Internal quotation marks omitted.) *State* v. *Cobbs*, 203 Conn. 4, 11, 522 A.2d 1229 (1987).

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defen-

---

[6] The defendant has not briefed his claims that the evidence was insufficient to convict him of tampering with a witness. We therefore consider his claim abandoned and will not afford it review. See *Strobel* v. *Strobel*, 64 Conn. App. 614, 623, 781 A.2d 356, cert. denied, 258 Conn. 937, 786 A.2d 426 (2001).

dant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citations omitted; internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 377–78, 796 A.2d 1191 (2002). Finally, it is beyond question that the trier of fact, here, the jury, is the arbiter of credibility. This court does not sit as an additional juror to reconsider the evidence or the credibility of the witnesses. See *State* v. *Colon*, 71 Conn. App. 217, 224–25, 800 A.2d 1268, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002).

A

The defendant's first sufficiency claim is that the state failed to prove beyond a reasonable doubt that he was the person who caused the victim's physical injury and, therefore, that the jury could not have found him guilty

of assault in the first degree in violation of § 53a-59 (a) (1) or (5). We disagree.

The essence of the defendant's claim is that the testimony of the victim and Guadalupe was insufficient to convict him. The basis of his claim is the victim's inability or failure to tell the police who shot him when the police visited him at the hospital immediately after the incident.[7] The defendant also relies on inconsistencies in Guadalupe's testimony and his belief that Guadalupe had reason to implicate him falsely as the shooter. The defendant does not challenge the sufficiency of the evidence the state produced to prove the serious physical injury, physical injury or deadly weapon, dangerous instrument or firearm elements of the statutory subdivisions.

In his brief to this court, the defendant also does not provide an analysis of whether the state failed to prove the element of intent. Instead, he focuses on whether "the state's evidence is improbable and unconvincing and where all the facts found are insufficient to prove the guilt of the defendant beyond a reasonable doubt." *State* v. *Osman*, 218 Conn. 432, 437, 589 A.2d 1227 (1991). On the basis of our review of the trial transcript, we cannot conclude that there was insufficient evidence from which the jury could have found the defendant guilty of assault in the first degree. The jury reasonably could have concluded that the defendant intended to cause the victim harm. When the victim and the defendant first stepped outside the club after bumping into

---

[7] On the basis of our review of the evidence presented to the jury and our review of the evidence presented at the suppression hearing; see part II; we are of the opinion that in his brief to this court, the defendant has argued inferences drawn from the evidence presented at the suppression hearing with the evidence presented to the jury. The jury was not present at the suppression hearing and, thus, whatever evidence was presented at the suppression hearing cannot be considered in our review of the sufficiency of evidence the jury considered in reaching its verdicts.

one another, the defendant displayed a knife and refused to have a fistfight with the victim. The defendant's treatment of Guadalupe when she refused to give him his jacket is evidence of his determination to inflict the harm that he did inflict.

The victim's testimony that the defendant shot him was not contradicted and was consistent with Guadalupe's testimony about the shooting. One of the defendant's arguments regarding his sufficiency claim is that the victim did not describe the defendant as the shooter when the police visited the victim at the hospital. First, there is no evidence that the police at the hospital asked the victim to describe the perpetrator of the crime and, second, the medical personnel did not permit the police to question the victim due to his injuries.[8] In assessing the credibility of a witness, jurors are permitted to rely on their everyday experience. Common sense does not take flight at the courthouse door. *State* v. *Edward B.*, 72 Conn. App. 282, 295, 806 A.2d 64, cert. denied, 262 Conn. 910, 810 A.2d 76 (2002). The jury reasonably could have inferred that the victim was not able or permitted to discuss the shooting until he had been released from the hospital. When the victim was released from the hospital, he was able to identify the defendant from an array of photographs. He also identified the defendant

---

[8] Defense counsel cross-examined the victim, in part, as follows:

"Q: And you didn't give the police any description of the shooter that night at the hospital. Correct?

"A: They only told me that I was in the [club], and I say, yeah, I got shot in the [club]. They don't say anything else because the doctor say you got to go out and they left.

"Q: They never asked you to describe the person who shot you in that one—

"A: Not that day.

"Q: But you didn't give them a description of the guy while you were in the hospital that night. Correct?

"A: No, I might not.

"Q: But then you talked to the police when you got out of the hospital. Correct?

"A: Um-hum."

in the courtroom. The victim's testimony alone was sufficient for the jury to find that the defendant had shot the victim.

The defendant has made several arguments with respect to the credibility of Guadalupe's testimony. We acknowledge that Guadalupe's testimony was at times inconsistent. The defendant attempted to demonstrate that Guadalupe had personal reasons to implicate him. She had known the victim for fifteen years while they attended school, and she had known the defendant for several weeks. At trial, the defendant asked certain questions of Guadalupe in an effort to demonstrate that he had spurned her advances. She also admitted that she had implicated the defendant when the police informed her that if she did not tell them what she knew, she might face charges as an accomplice for helping the defendant avoid capture.

To be sure, the nature of the defendant's relationship with Guadalupe is unclear. As to the precipitating events at the club on the night in question, however, the testimony of Guadalupe and the victim is similar. Guadalupe's testimony about the shooting itself also is consistent with that of the victim. We do not know whom or what the jury believed, but as we have stated, the victim's testimony alone was sufficient for the jury to find that the defendant had shot him.

B

The defendant also claims that there was insufficient evidence for the jury to find beyond a reasonable doubt that he possessed a weapon at the time the victim was shot. That claim is related to the defendant's conviction of criminal possession of a firearm in violation of § 53a-217[9] and carrying a pistol or revolver without a permit in violation of § 29-35. The substance of his argument

---

[9] See footnote 5.

is substantially the same as the one that he made with respect to the conviction of assault in the first degree, i.e., that there was insufficient evidence that he was the perpetrator of the crime. The defendant's argument is no more persuasive with respect to the weapons charges than it was with respect to the charge of assault in the first degree.

With respect to the defendant's claim, the relevant provisions of § 53a-217 are that a person is guilty of criminal possession of a firearm when he possesses a firearm and has been convicted of a felony. General Statutes (Rev. to 1997) § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ." The defendant does not challenge the evidence that he is a convicted felon,[10] that he did not have a permit for the pistol he used to shoot the victim, or that the pistol was operable.[11] He claims merely that the evidence was insufficient to prove that he shot the victim. Furthermore, he has cited no law and provided no analysis to support his claim.

We already have concluded that there was sufficient evidence before the jury from which it could find beyond a reasonable doubt that the defendant demanded his jacket, took a chrome pistol from the jacket and shot the victim. The victim saw the defendant take the pistol from the jacket and shoot him from a range of four to five feet. Guadalupe heard a shot and turned to see the defendant holding a chrome pistol in his hand. The defendant relies on his attack on the

---

[10] The defendant stipulated that he is a convicted felon. See part III.

[11] To convict a person under § 53a-217, the firearm must be operable. See *State v. Banks*, 59 Conn. App. 112, 130–32, 755 A.2d 951, cert. denied, 254 Conn. 950, 762 A.2d 904 (2000). There was no doubt as to the operability of the pistol in question here.

credibility of the witnesses to substantiate his claim of insufficient evidence. The jury alone decides the credibility of the witnesses, not this court. We conclude that the jury reasonably could have found that the defendant had possession of the pistol because he "exercised intentional dominion and control over the firearm and . . . he had knowledge of its character." *State* v. *Williams*, 258 Conn. 1, 12, 778 A.2d 186 (2001). The court therefore properly denied the defendant's motion for a judgment of acquittal.

## II

The defendant's second claim is that his federal and state constitutional rights[12] were violated by the court's denial of his motion to suppress the victim's pretrial identification of him from an array of photographs. The defendant claims specifically that the photographic identification process was unnecessarily suggestive and unreliable because (1) the victim was unable to identify the person who shot him at the time the police talked to the victim in the emergency room, (2) prior to the identification, the police told the victim, in response to his query, that they had a suspect named Little Boy and (3) there were a number of men with the defendant at the time of the shooting, but only his photograph was included in the array. Furthermore, the defendant claims that because the photographic identification violated his constitutional rights, the victim's in-court identification of him was tainted. We disagree.

The following facts are relevant to our review of the defendant's claims related to the motion to suppress. Approximately one week before trial, the defendant filed motions to suppress the photographic identifications of him provided by the victim and Guadalupe. The

---

[12] The defendant claims that his rights under the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut were violated.

defendant also claimed that any in-court identification of him would be irretrievably tainted by the allegedly suggestive photographic identifications. Several days later, the court held a hearing on the motions to suppress. The victim, Guadalupe and Grabowski testified at the hearing.[13]

The salient facts found by the court were that the lighting both inside and outside the club on October 12, 1997, was good. The victim was playing pool when he backed into the defendant. The two men confronted one another face to face and exchanged words. They went outside to settle their dispute and again confronted one another from a distance of about five feet. Again, just prior to the shooting, the victim and the defendant confronted one another, and the victim saw the defendant take the pistol from his jacket and shoot him. Those confrontations were no less than several minutes in duration.

The court also found that on the night in question, the victim did not know the defendant and had never seen him before. The victim had not seen the defendant since the incident. Grabowski and another officer visited the victim in the hospital emergency room. The victim told the officers that he did not know who shot him. The police were unable to continue their interview because medical personnel were examining and treating the victim. The victim, therefore, was unable to provide a description of his assailant at that time. The victim remained in the hospital for twelve days.

On the night of the shooting, Guadalupe identified the defendant by his street name, Little Boy, as the perpetrator. After the victim had been discharged from the hospital, Grabowski spoke to him by telephone to

---

[13] Following the evidentiary hearing on the motions to suppress, the defendant withdrew his motion to suppress Guadalupe's pretrial identification of him.

arrange a time to take a statement from him. During the telephone conversation, the victim asked Grabowski whether the police had a suspect. Grabowski responded that a woman had told the police that the person was known as Little Boy. The court found that there was no evidence that the victim knew who Little Boy was because he had never seen the defendant before or after the incident.

Grabowski interviewed the victim at his home on the afternoon of November 3, 1997, approximately three and one-half weeks after the shooting. Grabowski showed the victim eight photographs of similar appearing Hispanic males, all having the same skin complexion and style of facial hair. The victim selected the photograph of the defendant and signed the reverse side. At the conclusion of the hearing, the court denied the motion to suppress the victim's photographic identification.

The court later provided a lengthy recitation of its findings of fact and the legal basis for denying the defendant's motion to suppress the photographic and in-court identifications by the victim. The court determined that the identification procedure used by Grabowski was not overly suggestive and that the identification procedure was reliable in light of the totality of the circumstances. The victim's in-court identification of the defendant, therefore, was not tainted by the photographic identification.

"The standard of review for a trial court's ruling on a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ."

(Citations omitted; internal quotation marks omitted.) *State* v. *Czyzewski,* 70 Conn. App. 297, 301, 797 A.2d 643, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002). "[O]ur review is plenary and we must determine whether the trial court's conclusions of law are legally and logically correct and find support in the stipulated facts." (Internal quotation marks omitted.) Id.

"A defendant who moves to suppress identification evidence bears the initial burden of proving that the identification resulted from an unconstitutional procedure. . . . *State* v. *Hinton,* 196 Conn. 289, 293, 493 A.2d 837 (1985). To succeed on the motion to suppress, the defendant must prove (1) that the identification procedures were unnecessarily suggestive, and (2) that the resulting identification was not reliable in the totality of the circumstances. *State* v. *Perez,* 198 Conn. 68, 73, 502 A.2d 368 (1985); *State* v. *Parker,* 197 Conn. 595, 598, 500 A.2d 551 (1985); *State* v. *Hinton,* supra, 292–93." (Internal quotation marks omitted.) *State* v. *Askew,* 44 Conn. App. 280, 283–84, 688 A.2d 1346 (1997), rev'd on other grounds, 245 Conn. 351, 716 A.2d 36 (1998).

"[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) *State* v. *Reid,* 254 Conn. 540, 554, 757 A.2d 482 (2000). "An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Internal quotation marks omitted.) Id., 555.

We have reviewed the transcript and exhibits from the hearing on the motion to suppress and the court's memorandum of decision. We concur with the court's analysis and reasoning. The defendant's argument that

the identification procedure was unnecessarily suggestive stems from the fact that Grabowski responded affirmatively to the victim's question as to whether the police had a suspect. The analysis provided by our Supreme Court in *Reid* has guided our review.

"It is proper for a court, in determining whether an identification procedure was unduly suggestive, to consider the fact that a police officer tells a victim that a suspect is in a photographic array. . . . Such a statement, however, is not enough to render an identification procedure unduly suggestive. . . . It is true that [our Supreme Court] previously has stated that an identification procedure could be invalidated when police expressly indicate to a victim that a suspect is included in a photographic array. . . . The admissibility of identification testimony is to be determined by the totality of the circumstances, however. Even if the identification procedure is unnecessarily suggestive because of a police statement, the identification may still be admitted if the totality of the circumstances is such that the identification was nevertheless reliable." (Citations omitted.) Id., 556.

In the case before us now, Grabowski did not tell the victim that the person the police suspected of shooting him was in the photographic array. He did tell the victim, however, that the police had a suspect by the street name of Little Boy. The victim did not know the defendant or his street name and, therefore, such information could not have been unnecessarily suggestive. The court found that when Grabowski showed the victim eight photographs, he instructed the victim to examine them closely and take his time to see if he recognized anyone. The evidence supports that conclusion. The court concluded that it was reasonable for the victim to assume that one of the individuals in the photographs was the person who had shot him even

without Grabowski's statement. The court's conclusion is consistent with our law.

Our Supreme Court "has stated explicitly that little harm is likely to arise where the [victim], even without the police comment, would have inferred that the occasion for his being requested to identify someone is that the police have a particular person in mind who has been included among those to be viewed. . . . When presented with a photographic array by the police, crime victims reasonably can surmise that the police may consider one of the persons in the array to be a suspect in the case." (Citation omitted; internal quotation marks omitted.) Id., 557.

The defendant also contends that the photographic array was unnecessarily suggestive because photographs of other individuals present on the night of the shooting were not included. The defendant has provided no legal basis for his argument that all persons present at the scene of a crime must be included in a photographic array, and we know of none. "We repeatedly have held that [briefs containing] nothing more than bare statements of error will not be reviewed by this court." *State* v. *Weiner*, 61 Conn. App. 738, 756, 767 A.2d 1220, cert. denied, 256 Conn. 902, 772 A.2d 600 (2001).

We also agree with the court's assessment of the appearance of the men in the photographic array. The array contained eight photographs of Hispanic males whose complexion and style of facial hair were similar. We conclude, therefore, that the photographic array did not violate the defendant's constitutional rights. See *State* v. *Taylor*, 239 Conn. 481, 499–500, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997).

Even if the defendant were to have prevailed on the first prong of the test, which he has not, we could not

conclude under the totality of the circumstances that the victim's pretrial identification of the defendant was unreliable. See *State* v. *Reid*, supra, 254 Conn. 554–55. "The factors to be considered in determining the reliability of an identification subsequent to a suggestive identification procedure include the opportunity of the witness to view the criminal at the time of the crime. [T]he witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation and the time between the crime and the confrontation . . . [are] to be weighed [against] the corrupting effect of the suggestive identification itself." (Internal quotation marks omitted.) *State* v. *Henton*, 50 Conn. App. 521, 534–35, 720 A.2d 517, cert. denied, 247 Conn. 945, 723 A.2d 322 (1998); see also *State* v. *Ramsundar*, 204 Conn. 4, 10–11, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987).

The defendant's primary argument in support of his claim that the victim's identification was unreliable is that the victim did not describe the person who shot him when the police talked to him at the emergency room shortly after the shooting. The court found the victim's explanation credible. The victim did not know the defendant and had never seen him prior to the night in question. The police were not able to ask the victim for a physical description because hospital personnel asked the police to leave so that they could tend to the victim's wounds. The trier of fact is the arbiter of credibility, and the court's conclusion that the police were prevented from talking to the victim is supported by the evidence.

In its memorandum of decision, the court also addressed the evidence with respect to the other reliability factors, noting that each case is to be decided on its own facts. See *State* v. *Reid*, supra, 254 Conn. 554. The victim had several opportunities to view the defen-

dant prior to the shooting and was looking at him at the time of the crime. The lighting was good both inside and outside the club. The victim paid considerable attention to the defendant during their face-to-face confrontation, their exchange of hostile words and when the defendant drew a knife.

As to the certainty of the victim's identification of the defendant, Grabowski instructed the victim to take his time and look at the photographs carefully. There was no evidence that the victim was hesitant or uncertain when he selected the defendant's photograph. Finally, the court concluded that the three and one-half week interval between the crime and the time the victim identified the defendant's photograph was not so protracted as to render the identification unreliable. For most of that time, the victim was a patient in the hospital. We conclude that the court's findings are supported by the record and that the court's inference that the victim's pretrial identification was reliable was reasonable.

We therefore conclude that the court properly denied the defendant's motion to suppress and that the victim's in-court identification of the defendant was not tainted.

### III

The defendant's third claim is that the court abused its discretion by permitting the state to identify by name his prior felony convictions, rather than merely the legal classification of those felonies, and also to reveal that at the time he shot the victim, the defendant previously had been convicted of two felonies. The defendant's claim relates to the evidence necessary to convict him of criminal possession of a firearm pursuant to § 53a-217.[14] Specifically, the defendant argues that § 53a-217 requires evidence only of the classification of the felon-

---

[14] See footnote 5.

ies, not the name of the felonies. The defendant also argues that the evidence of the name of the felonies and the number of the defendant's felony convictions should have been excluded because those facts unfairly prejudiced the jury against him, thereby requiring a new trial.

As the state was ending its case-in-chief, it sought to place into evidence a multipage document concerning the defendant's arrest and conviction of robbery in the first degree. The defendant agreed to stipulate to the fact that he had been convicted of a felony, but objected to the entire document's being placed into evidence. The defendant argued strenuously that only the fact that he previously had been convicted of a felony was necessary for the state to prove the element of a felony conviction under § 53a-217. The state agreed that much of the information in the document was irrelevant, but persisted in offering into evidence the fact that the defendant had been convicted on October 22, 1984, of two counts of robbery in the first degree. The defendant continued to object, arguing that the name of the felonies and the number of them were prejudicial to him. The court considered the defendant's argument, but overruled the objection, concluding that the prejudicial effect, if any, was minimal, as the conviction of two counts of robbery in the first degree arose from acts committed on the same day, the charges were tried together and the judgment of conviction included both counts.[15] The court also charged the jury as to how it

---

[15] In overruling the defendant's objection, the court stated in part: "[Two robberies] occurred on November 14, 1983, and he was tried on that information, and on October 22, 1984, he was sentenced . . . . Well, if that's what happened, the fact that he was, on that date, convicted of two robberies that stemmed apparently from the—at least, the robberies occurred on the same date and he was convicted after a trial of those two robberies, then I think I would be inclined to admit that much of it. It's not like they're putting in a robbery that he was convicted of on such and such a date, and then another robbery occurring on a completely different date that he was convicted of on another date.

\* \* \*

was to use that evidence of the defendant's prior conviction.[16]

"[O]ur standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling. . . . It is a fundamental rule of appellate review of evidentiary rulings that if error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him." (Internal quotation marks omitted.) *State* v. *Henry*, 72 Conn. App. 640, 662, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002). The defendant, here, has conceded that his claim is not of constitutional dimension.

"[T]here are two components to relevant evidence: materiality and probative value . . . . [E]vidence is relevant if it has a tendency to establish the existence

---

"I think that given that the two charges apparently emanate from the same incident, and the conviction was on two charges on that particular date, I think the prejudicial effect of that is minimal and it's being offered to show that he was convicted, and that's the date he was convicted on. And I think it's coming in absent a stipulation about what happened on that date, and it should be before the jury rather than just giving them half of it, so to speak."

[16] The court charged the jury in part: "A person is guilty of criminal possession of a firearm when he possesses a firearm and has been convicted of a class B felony. . . . Now, here, of course, with reference to the third element, that is, that at the time the defendant possessed the firearm, the defendant had previously been convicted of a class B felony. Counsel have stipulated to the defendant's prior class B felony convictions for purposes of this third element of the crime. The stipulation was entered into just with respect to the element of this crime. . . . [The defendant] is on trial just for the incident which took place on October 12, 1997, and whatever happened or might have happened way back a long time ago in 1984 is to play no role whatsoever in your decision in this case other than that evidence as proof of a necessary element of this particular charge in count three, that is, the prior conviction only."

of a material fact." (Internal quotation marks omitted.) *State* v. *Faria*, 47 Conn. App. 159, 169, 703 A.2d 1149 (1997), cert. denied, 243 Conn. 965, 707 A.2d 1266 (1998). Here, evidence that on the date the victim was shot, the defendant had twice been convicted of robbery in the first degree was relevant and material to prove that he was in criminal possession of a firearm in violation of § 53a-217.

As to the second element pertaining to the relevance of evidence, the probative value of prior misconduct must outweigh the prejudicial effect. See id., 170. "[R]elevant evidence that is potentially prejudicial should be excluded . . . where the facts offered may unduly arouse the jury's emotions, hostility or sympathy . . . ." (Internal quotation marks omitted.) Id., 174. "Prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous." (Internal quotation marks omitted.) Id. "Some degree of prejudice inevitably accompanies the admission of evidence of a defendant's other misconduct." Id., 175. "Evidence is prejudicial when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." (Internal quotation marks omitted.) Id.

The essence of the defendant's argument is that it was unnecessary for the court to admit the fact that he twice had been convicted of robbery in the first degree. Facts concerning the defendant's single conviction of a class B felony were sufficient. In addition, the defendant argues that proof of his conviction of two counts of robbery in the first degree may have influenced the jury to think that he was a hardened criminal. The state counters that it was entitled to put into evidence the most convincing evidence available to meet its burden of proof beyond a reasonable doubt. The state contends that identifying the felony may have

helped the defendant as much as it may have hurt him because the jury would not be left to speculate as to the nature of the defendant's former crime. The court reasoned that because the defendant's conviction arose out of crimes committed on the same day and were linked at trial, there was no prejudice to him.

Even if we were to assume, without deciding, that the evidence of conviction of two counts of robbery in the first degree was cumulative, the court's admission of the name and number of the defendant's felony convictions into evidence was, at most, harmless error. Because the parties stipulated to the fact that the defendant previously had been convicted of a felony, the court so informed the jury by identifying the conviction and the date of the conviction. No lurid details of the robberies were before the jury. Most significantly, the court in its charge stated and repeated that the jury was not to consider the conviction of the robbery charges for any purpose other than relative to the third element of the crime of criminal possession of a firearm. The court specifically instructed the jury that it should not be concerned otherwise with what the defendant had done long ago. A jury is presumed to follow the court's instructions unless there is a clear indication to the contrary. *State* v. *Booth*, 250 Conn. 611, 626, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). Finally, we cannot perceive that the jury was influenced, at least with respect to the assault charge, by the evidence. The jury heard evidence from two eyewitnesses that the defendant shot the victim.

We therefore conclude that the defendant was not prejudiced by the court's admitting evidence of his prior felony convictions into evidence.

IV

In its brief to this court, the state alerted us to the fact that the court had assumed the role of fact finder

with respect to the sentence enhancement provision of § 53-202k.[17] See *State* v. *Dash*, 242 Conn. 143, 146–50, 698 A.2d 297 (1997). We agree with the state that the jury and not the court was required to determine whether the defendant used a firearm to commit a class A, B or C felony.[18] *State* v. *Montgomery*, 254 Conn. 694, 736, 759 A.2d 995 (2000). We conclude, however, that under the facts of this case, the error was harmless. See *State* v. *Price*, 61 Conn. App. 417, 420–21, 767 A.2d 107, cert. denied, 255 Conn. 947, 769 A.2d 64 (2001).

"Section 53-202k was enacted as part of a comprehensive legislative plan for dealing with assault weapons. . . . It provides for a mandatory five year term of imprisonment whenever a defendant, in the commission of [any class A, B or C] felony uses . . . any firearm as defined in [General Statutes §] 53a-3."[19] (Internal quotation marks omitted.) *State* v. *Cooper*, 65 Conn. App. 551, 573, 783 A.2d 100, cert. denied, 258 Conn. 940, 786 A.2d 427 (2001). "[T]he five year sentence runs consecutively with, and is in addition to, the sentence imposed for the underlying felony. . . . In a jury trial, if the state has accused a defendant of violating § 53-202k, the jury must determine whether the state has proven the elements necessary for a sentence enhancement under that section. . . . Additionally, because a finding under § 53-202k *exposes* a defendant to a penalty beyond the prescribed statutory maximum for the underlying offense, the sixth and fourteenth amendments to the United States constitution require the state to prove the elements of § 53-202k beyond a reasonable doubt. . . .

---

[17] See footnote 4.

[18] At sentencing, the state argued that the court should apply General Statutes § 53-202k when sentencing the defendant. Assault in the first degree is a class B felony. See General Statutes § 53a-59 (b).

[19] General Statutes § 53a-3 (19) provides: " 'Firearm' means any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged . . . ."

"Nonetheless, although a court is required to have the jury determine whether the state proved that the defendant is subject to a sentence enhancement under § 53-202k, failure to do so can constitute harmless error. . . . Such an error is harmless only if it appears beyond a reasonable doubt that the jury would have found that the defendant was subject to a sentence enhancement under § 53-202k had it been instructed on the elements of that section and been permitted to determine whether the state had satisfied its burden of proof." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 573–74.

Under the harmless error analysis, the question in this case is whether it was "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty [of the enhancement element] absent the error." *Neder* v. *United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). In this case, by virtue of the jury's determination that the defendant had committed assault in the first degree, a class B felony, it also necessarily found that the state had satisfied the element of § 53-202k that the defendant had committed a class B felony. Moreover, the information alleged that the defendant committed the crime by means of a firearm. The jury, therefore, had to have found that the defendant committed the assault with a firearm. Furthermore, when the court charged the jury on the elements of assault in the first degree, it referenced the defendant's use of a pistol. The fact that the crime was carried out with the use of a firearm was uncontroverted and supported by the overwhelming evidence. Thus, the jury's finding the defendant guilty of assault in the first degree necessarily included a finding that the defendant had used a firearm in the commission of that offense. See *State* v. *Roman*, 67 Conn. App. 194, 211, 786 A.2d 1147 (2001), cert. granted on other grounds, 259 Conn. 920, 791 A.2d 567 (2002).

Accordingly, we conclude that the jury would have found that the defendant was subject to a sentence enhancement under § 53-202k had it been instructed on the elements of that section and permitted to determine whether the state had satisfied its burden of proof. In sum, the court's failure to submit the applicability of § 53-202k to the jury was harmless, and its imposition of an additional five year term of imprisonment was proper.

The judgments are affirmed.

In this opinion the other judges concurred.